UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOMMY DOWDY, et al.,<br>    Plaintiffs,<br>v.<br>METROPOLITAN LIFE INSURANCE COMPANY,<br>    Defendant. | Case No. 15-cv-03764-JST<br><br>**ORDER GRANTING JUDGMENT IN FAVOR OF DEFENDANT**<br>Re: ECF Nos. 21, 24 |

Before the Court are Cross-Motions for Judgment filed by Plaintiffs Tommy Dowdy and Sharon Morris-Dowdy, and Defendant Metropolitan Life Insurance Company. ECF Nos. 21, 24. The Court concludes that Plaintiffs have not demonstrated that they are entitled to coverage under their coverage policies with Defendant. Accordingly, the Court will grant Defendant's Motion for Judgment and deny Plaintiff's motion.

## I.   BACKGROUND

This case is brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and involves Plaintiffs' claim for accidental dismemberment benefits after Mr. Dowdy was involved in a severe car accident, suffered several injuries, and subsequently underwent an amputation below the knee of his left leg. Though the parties agree generally on the major events leading to this dispute, they disagree on many details regarding Mr. Dowdy's medical treatment and Plaintiffs' subsequent benefits claim with Defendant.

### A.   Factual History

On September 13, 2014, Mr. Dowdy, then age 60, was involved in a single car accident in which it left the road at high speed, struck a column, and went down an embankment several

hundred feet. AR120.[1] There was massive damage to the vehicle, and a "prolonged extrication" was required to remove Mr. Dowdy from the wreck. Id. Mr. Dowdy was then brought to the Emergency Room at John Muir Medical Center in Concord. Id.

Though the parties disagree on the details of Mr. Dowdy's injuries, in particular to his left leg, it is clear that Mr. Dowdy sustained a number of serious injuries in the accident. His discharge report identifies "extensive bilateral rib fractures," "extensive right lung opacities," a "sternal facture," "pulmonary contusion," and "cardiac contusion" among the injuries sustained upon admittance. AR179-80. As relevant here, it also identifies an "open left ankle fracture." Id.

Mr. Dowdy underwent several surgeries and medical treatments for his injuries between September 14 and October 5, 2014, as part of a "prolonged ICU hospital course." AR181-82. He was eventually discharged on October 11, 2014, to a "skilled nursing facility." AR182. At the time, it was noted he was "nonweightbearing" due to a "left lower extremity." Id.

On January 17, 2015, approximately four months after the accident, Mr. Dowdy was again admitted to the hospital. The surgeon's report states that Mr. Dowdy had "underwent initial treatment" to his left ankle fracture, described as "treatment with irrigation and debridement of his open fracture and reduction and treatment in a spanning external fixator." AR222. It then states that he "underwent aggressive wound care," due to "a medial wound, which has been worked on for the past several months, but has been unsuccessful for healing." Id. "Over the past several months, [Mr. Dowdy] had very poor signs of healing," and "[a]ttempts at soft tissue coverage [were] unsuccessful." Id.

"Due to his multiple comorbidities as well as nonhealing wounds to his left leg and osteomyelitis, it was elected to undergo a left below-the-knee amputation." Id. The amputation took place on February 13, 2015, five months after the accident. Id.

Through Mrs. Dowdy's employment at Bank of the West, Plaintiffs had purchased accidental death and dismemberment insurance from Defendant. Though the parties do not specify the exact date when Plaintiffs initiated a claim for dismemberment benefits with

---

[1] References to the administrative record are cited by page number ,e.g. "AR120"

2

1  Defendant, it is clear the claim was being processed before the amputation occurred. See AR51.
2  The claim was first denied on February 16, 2015, as MetLife asserted that at this point, they had
3  received "no indication that Mr. Dowdy suffered an actual severing injury" to his ankle outside of
4  the open fracture sustained in the accident. AR215. Upon receiving medical records showing the
5  amputation, Defendant again denied the claim on April 2, 2015, stating that the records "show the
6  amputation was contributed [*sic*] and complicated by diabetes," and citing to the surgeon's report.
7  AR237. Plaintiffs appealed the denial, and Defendant upheld the denial on July 1, 2015, stating
8  again that the amputation was "caused or contributed to" by Mr. Dowdy's diabetes and therefore
9  excluded from the plan, and also that the amputation was not "solely caused by the injuries
10 sustained in the motor vehicle accident." AR262.

### B.  Procedural History

Plaintiffs brought this complaint under ERISA challenging Defendant's denial of their claim on August 17, 2015. ECF No. 1. The parties agreed that the clam could be resolved through cross-motions for judgment, ECF No. 14, which were filed on March 3, 2016, ECF Nos. 21, 24. Oppositions were filed on March 17, 2016, ECF Nos. 27, 30, Defendant filed its reply on March 24, 2016, ECF No. 33, and Plaintiffs filed their reply on March 31, 2016, ECF No. 35. The parties have stipulated to a *de novo* standard of review. ECF No. 19.

## II.  JURISDICTION

Plaintiff's cause of action arises under ERISA, a federal statute. The Court therefore has federal-question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## III.  LEGAL STANDARD

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits.'" Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989) (internal citations omitted). ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). "ERISA's civil-enforcement provision ... allows a claimant 'to recover benefits due to him under the terms of his plan [and] to enforce his rights under the terms of the plan.'" Muniz v. Amec Const. Mgmt., Inc., 623 F.3d

1290, 1294 (9th Cir. 2010) (quoting 29 U.S.C. § 1132(a)(1)(B)).

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115. In this case, the parties have stipulated, and the Court agrees, that *de novo* review is appropriate. See ECF No. 19. Under *de novo* review, "the court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits with no deference given to the administrator's decision." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

ERISA's "statutory scheme ...'is built around reliance on the face of written plan documents.'" U.S. Airways, Inc. v. McCutchen, 133 S.Ct. 1537, 1548 (2013) (quoting Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995)). "Courts construe ERISA plans, as they do other contracts," with reference to "ordinary principles of contract interpretation." U.S. Airways, 133 S.Ct. at 1548–49 (2013). Ambiguities are construed against the drafter and in favor of the insured. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999).

"When a Court conducts a *de novo* review of an administrator's denial of long-term disability benefits in an ERISA case, the Court effectively conducts a bench trial upon the record," and can proceed to enter judgment pursuant to Rule 52. Allenby v. Westaff, Inc., Case No. 04–2423 TEH, 2006 WL 3648655, at *1 (N.D. Cal. Dec. 12, 2006) (citing Kearney, 175 F.3d at 1094–95). "In a Rule 52 motion ... the court does not determine whether there is an issue of material fact, but whether the plaintiff is disabled under the policy, and is to 'evaluate the persuasiveness of conflicting testimony,' and make findings of fact." Wiley v. Cendant Corp. Short Term Disability Plan, Case No. 09–00423 CRB, 2010 WL 309670, at *6 (N.D. Cal. Jan. 19, 2010) (quoting Kearney, 175 F.3d at 1095). The Court's review is limited to the administrative record unless "circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review." Kearney, 175 F.3d at 1090 (quoting Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 944 (9th Cir. 1995)).

"[W]hen the court reviews a plan administrator's decision under the *de novo* standard of

review, the burden of proof is placed on the claimant." Muniz, 623 F.3d at 1294. The standard Plaintiffs must meet is preponderance of the evidence. Wiley v. Cendant Corp. Short Term Disability Plan, No. C 09-00423 CRB, 2010 WL 309670, at *7 (N.D. Cal. Jan. 19, 2010). Moreover, as Defendant notes, Plaintiffs' policy establishes that it is the claimant's burden to provide proof that the claimed loss is covered by Defendant. ECF No. 24 (citing to AR 320); see also Wiley, 2010 WL 309670, at *7 (enforcing a policy provision placing the burden on claimant to show entitlement to benefits).

## IV. DISCUSSION

The central question in dispute is whether Mr. Dowdy's amputation entitles him to benefits under Plaintiffs' accidental death and dismemberment coverage with Defendant. More specifically, Defendant contends that the amputation is not covered because the accident was not the "direct and sole cause" of the loss, and because an exclusion for "physical or mental illness" that "caused or contributed to" the loss applies to Mr. Dowdy's diabetes. AR349; see also ECF No. 24 at 5. In addition, Plaintiffs offer additional evidence outside of the administrative record, and argue that the Court should consider it because Defendant has acted in bad faith and thus did not impartially administer their claim. Finally, the parties also dispute the amount of benefits to which Plaintiffs would be entitled.

The Court begins by addressing the issue of extrinsic evidence. It concludes that Plaintiffs have not demonstrated sufficient cause for the Court to consider evidence outside of the administrative record. Next, the Court concludes that Plaintiffs have not met their burden of demonstrating that they are entitled to benefits for Mr. Dowdy's amputation. The Court therefore does not address the question of the amount of benefits that might be due.

### A. Extrinsic Evidence

As both sides acknowledge, the Court's review of an ERISA claim is generally limited to the record that was before the administrator at the time it made its decision. Kearney, 175 F.3d at 1090. The Ninth Circuit, however, has held that the district court, in its discretion, may allow additional exhibits when appropriate:

In our view, the most desirable approach to the proper scope of *de novo* review

> under ERISA is one which balances the [ ] multiple purposes of ERISA. Consequently, we adopt a scope of review that permits the district court *in its discretion* to allow evidence that was not before the plan administrator. The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator ... at the time of the determination.

Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 943-44 (9th Cir. 1995) (quoting Quesinberry v. Life Ins. Co. of North Am., 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)) (alterations and emphasis in original). The Ninth Circuit emphasized "that a district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." Id. at 944. In Opeta v. Northwest Airlines Pension Plan for Contract Employees, 484 F.3d 1211, 1217 (9th Cir. 2007), the Ninth Circuit, again quoting Quesinberry, provided a "non-exhaustive list of exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process."

Here, both parties cite to evidence outside of the administrative record. In regards to the causes of the injury and amputation, Plaintiffs' submitted evidence includes declarations by both Mr. and Mrs. Dowdy relating information regarding the accident, subsequent medical treatment, and amputation, see ECF Nos. 22, 23, the medical chart filled out by Dr. Christopher Coufal, Mr. Dowdy's chief orthopedic surgeon, ECF No. 25-1, and the Traffic Collision Report describing Mr. Dowdy's accident, ECF No. 23 at 7.[2] Defendant requests that this evidence be stricken. ECF No.

---

[2] According to Defendant, only four pages of the traffic report were submitted by Plaintiffs to them during the claims process, and therefore appear in the administrative record. ECF No. 30 at 4.

30 at 4-5.

Plaintiffs assert that this evidence should be considered because Defendant has acted in bad faith both in adjudicating Plaintiffs' claim and also in litigating this case. ECF No. 35 at 13. They cite to Opeta's reference, quoting Quesinberry, to two exceptional circumstances when extra-record evidence is appropriate: "instances where the payor and the administrator are the same entity and the court is concerned about impartiality," and "claims which would have been insurance contract claims prior to ERISA." ECF No. 35 (citing Opeta, 484 F.3d at 1217). Plaintiffs assert that despite Defendant's fiduciary duty to resolve their claim impartially, "[t]he only two documents MetLife was intent on acquiring . . . were the two documents most likely to contain evidence that would support a denial of coverage." ECF No. 35 at 12. While "Mrs. Dowdy placed over forty telephone calls to MetLife's claims adjustors, asking whether they had everything they needed," Plaintiffs assert that Defendant "never asked for, and never advised Mrs. Dowdy of the likely existence of, her husband's medical chart at Muir Orthopaedic Specialists." Id. at 13. Plaintiffs explain that "Mrs. Dowdy had never before applied for benefits under an ERISA policy" and that "[i]f MetLife had told her about [the medical chart], she would have acquired and submitted it." Id. at 8, 13.

Plaintiffs further argue that "doubts about MetLife's impartiality are sharpened by the deceptive manner in which MetLife has presented the administrative record to this Court." ECF No. 35 at 13. They contend that Defendant has "omitted critical, medically significant words from its quotations," "deleted inconvenient sentences," and "consistently mischaracterized the nature of Mr. Dowdy's leg injury." Id. "This," Plaintiffs assert, "is not the conduct of a plan administrator who understands and appreciates its fiduciary duty to assist its beneficiaries."[3] Id.

Plaintiffs' assertions of bad faith do not demonstrate a need to consider extrinsic evidence. First, while it may be true – and regrettable – that Defendant apparently was unhelpful to Mrs. Dowdy during the claims process, especially in light of her difficult financial position and her lack

---

[3] Defendant disputes this portrayal, asserting that it made a further inquiry for additional records but that Mrs. Dowdy declined to provide any additional ones. ECF No. 30 at 3, n.5 & n.6 (citing to AR232).

of expertise, that fact alone would not support a finding of "clear necessity" required for the Court to stray outside the traditional scope of ERISA cases. The Plaintiffs' benefits plan places the burden on its claimants to provide the necessary proof to support their claim. AR320. It was therefore Plaintiffs' responsibility to ensure the administrative record contained all documents necessary to adjudicate their claim. See Carrier v. Aetna Life Ins. Co., 116 F. Supp. 3d 1067, 1078-79 (C.D. Cal. 2015) (rejecting a plaintiff's contention that the court should consider extrinsic material "because Defendant is to blame for failing to obtain them earlier," in light of the disability policy placing the burden of proof on plaintiff). Under the terms of the plan, it does not appear that Defendant has violated any duty or committed any act that demonstrates a lack of impartiality.

Likewise, Plaintiffs' contention that Defendants have presented the Court with a "deceptive" case is unpersuasive. Plaintiffs do not point to any legal standard by which the Court could conclude that Defendant violated any duty to the Court or the Plaintiffs in their conduct of this litigation. If by "deceptive" conduct, Plaintiffs refer to the tactical move of relying on evidence favorable to one's position, that happens in all cases. Certainly, Plaintiffs have not demonstrated "circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." Mongeluzo, 46 F.3d at 943-44. The Court will therefore limit its consideration to the administrative record.[4]

Plaintiffs should also understand, however, that the Court's conclusion regarding Plaintiffs' entitlement to benefits would not be affected even if the Court could consider the extrinsic evidence. As noted below, the references in the administrative record to the impact of Mr. Dowdy's diabetes demonstrate that his accident was not the direct and sole cause of the amputation of his lower leg. Plaintiffs' extra-record evidence expands on the available medical evidence, but it does not refute this basic conclusion. In fact, the medical chart by Dr. Coufal,

---

[4] To be clear, this limitation applies to all extrinsic evidence offered by both parties. Defendant, for example, cites to a source outside of the administrative record with regards to the impact of diabetes on infection. ECF No. 24 at 7. Plaintiffs also offer additional evidence in support of their position in regards to the amount of benefits, an issue which the Court does not reach. ECF No. 27 at 11-12. None of this evidence may be considered.

8

which Plaintiffs contend they would have submitted to the administrative record if they had been aware of it, contains multiple references to the effect of Mr. Dowdy's diabetes that appear even stronger than those contained in the administrative record itself. On April 8, 2015, for example, Dr. Coufal opined that the amputation was necessary because Mr. Dowdy "went on to develop infection, nonunion, and MRSA infection, *which was not controllable with his insulin-dependent diabetes*." ECF No. 25-1 at 5 (emphasis added). On March 5, 2015, he similarly referred to Mr. Dowdy's infection and states that "[*d*]*ue to him having significant diabetes* and poor vasculature, he ended up undergoing a left below-the-knee amputation" to treat the infection. Id. at 6 (emphasis added). These statements explicitly link the presence of Mr. Dowdy's diabetes to the need to treat his infection with the more drastic remedy of amputation.

### B. Entitlement to Benefits

#### 1. Policy Provisions

As noted above, under both the *de novo* standard of review and the provisions of the MetLife policy, Plaintiffs bear the burden of demonstrating they are entitled to their requested benefits. Defendant contends that Plaintiffs have not met this burden with regards to Mr. Dowdy's amputation under two provisions of the policy. First, it notes that the plan only covers losses when the claimant "sustain[s] an accidental injury that is the Direct and Sole Cause of a Covered Loss," and points to the Direct and Sole Cause provision, which states: "Direct and Sole Cause means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes." AR349. Second, it points to Exclusion #1 in its policy, which states: "We will not pay benefits under this section for any loss caused or contributed to by:[] 1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity."

Defendant argues that while Mr. Dowdy's ankle injury was "serious," his ankle was not "severed" in the accident but was rather fractured. ECF No. 24 at 7. It quotes the emergency room medical report as stating that the left foot had a "dusky appearance," that there was "no active bleeding," and that Mr. Dowdy was able to "wiggle his toes in both feet." Id. (quoting AR 188-89). The amputation itself occurred five months later, when, according to Defendant, "[Mr.]

9

Dowdy's doctor noted that the facture had been appropriately treated but never healed and ultimately developed a serious infection – and that those were issues in which [Mr.] Dowdy's diabetes played a significant role."[5]

Plaintiffs contend that much of this description is misleading. They note that while the record refers to Mr. Dowdy's ankle injury sustained in the accident as a fracture, it also refers to it as a "near amputation," AR186 and as having been "semi-amputated," AR160. They also take issue with Defendant's reference to a lack of active bleeding upon admittance, suggesting that this was in fact because he was "profoundly hypotensive with systolic BP in the 50's," AR 189, upon arrival at the ICU. Likewise, they note that while the doctor's report does refer to Mr. Dowdy being able to "wiggle his toes in both feet," Defendant omits a key word in the doctor's description: "*amazingly*, he could wiggle his toes in both feet." AR188.

Having reviewed the medical evidence available in the record, the Court concludes that Mr. Dowdy's diabetes caused or contributed to the need for amputation. While it is true that Plaintiff's injury in the accident was serious, and was described in the record as a "near amputation," the actual loss at issue in Plaintiffs' claim is the surgical amputation that occurred on February 13, 2015 – five months after the accident. The notes of Mr. Dowdy's orthopedic surgeon makes clear that the amputation was completed to treat an aggressive infection, and that this decision was made at least in part due to the impact of Mr. Dowdy's diabetes. Dr. Coufal explains in a letter dated March 5, 2015 that the amputation was completed in order to deal with a wound and infection in the left ankle that was not healing:

> He had wound issues, *which were complicated by his diabetes*. The wound healing as well as his fracture itself was slow to heal and never had any significant healing in spite of being stabilized with the external fixator. He ended up developing deep infection in the right lower extremity consistent with osteomyelitis and sequestrum, which was related to original. injury. Eventually, *due to his comorbidities* as well as type of injury he ended up proceeding to an amputation.

AR230 (emphasis added). Dr. Coufal makes similar references when describing the reason for the

---

[5] Defendant also states that Plaintiff's amputation was an "elective procedure," focusing on a statement by Mr. Dowdy's surgeon that Mr. Dowdy "underwent elective below-the-knee amputation." ECF No. 24 at 5; AR230. The contention that this amputation was elective is so implausible that it requires no further discussion.

1   amputation in his medical report:

> Over the past several months, he has had very poor signs of healing, and CT scans have shown evidence of potential bony sequestrum indicating osteomyelitis of the leg. Attempts at soft tissue coverage have been unsuccessful. *Due to his multiple comorbidities* as well as nonhealing wounds to his left leg and osteomyelitis, it was elected to undergo a left below-the-knee amputation.

AR222 (emphasis added). Under Plaintiffs' insurance policy, it therefore appears that Plaintiff's diabetes "caused or contributed to" his need for amputation – indeed, Dr. Coufal explicitly states that the wound issues leading to the amputation were "complicated by his diabetes" and "due to his comorbidities."

Plaintiffs contend that at best, Mr. Dowdy's diabetes merely "may (or may not) have retarded his healing process, and this, in turn, may (or may not) have made it more difficult for Mr. Dowdy to fight off infections at the wound site." ECF No. 21-1 at 26. But it was "*the infections themselves*, and not Mr. Dowdy's *diabetes*, that 'complicated' Dr. Coufal's efforts to save Mr. Dowdy's injured leg." Id.

There is no doubt that the infection, caused by the injury sustained in Mr. Dowdy's car accident, was the predominant reason for the amputation. But that is not the operative question. Defendant's policy dictates that the accident must be the "direct and sole cause" of the loss and that no other physical or mental illness "caused or contributed to" that loss. Here, Mr. Dowdy's diabetes clearly contributed to his loss.

### 2. Plaintiffs' Additional Arguments

Plaintiffs offer additional arguments as to why Defendant's interpretation of the record is incorrect. First, they point to Exclusion #2 of MetLife's policy, which excludes losses caused or contributed to by "infection, other than infection occurring in an external accidental wound." AR349. Plaintiffs contend that the "*only* reasonable way . . . to interpret this language is that MetLife *intended to provide coverage losses caused or contributed to by infections occurring at a wound site whenever the wound was caused by the accident*." ECF No. 21-1 at 26. Put another way, Plaintiffs appear to be arguing that because the language of Exclusion #2 does not include "infection[s] occurring in an external accidental wound," the plan's intent was to cover such infections, and therefore that Mr. Dowdy's infection in his left ankle should be covered.

11

1  However, as Defendant points out, this inference is unpersuasive given that the language is
2  contained within an exclusion. See ECF No. 5-6, fn. 10.  The effect of the "other than infection
3  occurring in an external accidental wound" language is to omit such infections from the exclusion
4  – that is, to provide that such infections will not be excluded under this clause.  It does not follow,
5  however, that all such infections are therefore covered under the policy.  They could remain
6  excluded under some other provision or exclusion, such as the "physical or mental illness"
7  exclusion, as in this case.  Plaintiffs rejoin that this reading would "ignore the language that
8  provides coverage . . . because it is contained in an exclusion." ECF No. 35 at 5.  On the contrary
9  – this reading does not "ignore" the language at all, but rather reads it within its proper context.
10 For these reasons, Exclusion #2 does not entitle Plaintiffs to relief.
11  Next, Plaintiffs cite to McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1136 (9th Cir.
12 1996), in which the Ninth Circuit considered how to interpret an exclusion for preexisting
13 conditions in a disability policy.  The McClure court focused on whether the policy's preexisting
14 condition bar was conspicuous or inconspicuous, and concluded that the test when applying such
15 bars was different in each instance:

> [W]e hold that if the exclusionary language here in question is conspicuous it
> would bar recovery if a preexisting condition substantially contributed to the
> disability. This could result in a denial of recovery even though the claimed injury
> was the predominant or proximate cause of the disability. On the other hand, we
> hold that if the language is inconspicuous, a policy holder reasonably would expect
> coverage if the accident were the predominant or proximate cause of the disability.

Id.  Plaintiffs contend that the provisions in the policy on which Defendant relies are "buried deep
within the Plan Document, at page 66," and "sandwiched between scores of pages or irrelevant
insurance contract clauses." ECF No. 21-1 at 27.  Thus, they argue that the provisions are
inconspicuous.

This argument is not persuasive.  Though it is true that the provisions are contained on
page 66 of the document, this does not mean that they are inconspicuous.  The provisions are
contained on that page because that is the first page of MetLife's "Accidental Death And
Dismemberment Insurance" policy section.  The "Direct and Sole Clause" provision is the second
paragraph, and is identified by bolded "Direct and Sole Clause" beginning the sentence.  AR349.

12

Halfway down the page, there is a header in all capital letters stating: "EXCLUSIONS," at which point the policy lists the various exclusions to coverage. Id. Far from being "buried" within the document, it appears that in fact MetLife placed these provisions on the first and most prominent page of its Accidental Death and Dismemberment Insurance section. Moreover, the "scores of pages" surrounding this page were merely other sections covering other pieces of the plan, such as life insurance, AR336, or eligibility to continue benefits while disabled, AR346. These circumstances do not demonstrate that the provisions cited by Defendant are inconspicuous. Accordingly, under McClure, the Court would apply only the "substantial contribution" test. For the same reasons as stated above, the Court finds that the complications of Mr. Dowdy's diabetes substantially contributed to the need for amputation.

Lastly, Plaintiffs cite to three out-of-circuit cases to suggest that Defendant cannot rely on a "'but for' causation argument." ECF No. 27 at 20. They cite to Fought v. Unum Life Ins. Co. of America, 379 F.3d 997, 1009 (10th Cir. 2004), abrogated on other grounds by Metropolitan Life Ins. Co v. Glenn, 554 U.S. 105, 116 (2008), in which a claimant underwent an elective coronary artery revascularization surgery to treat her coronary artery disease. During the surgery, the doctors were required to perform a special procedure to close the surgical wound due to Ms. Fought's "narrow and osteoporotic" sternum, and the wound later became infected and required several additional procedures. Id. at 1000. Ms. Fought's insurance provider denied coverage for these later procedures based on the fact that Ms. Fought would never have received the surgery that led to the further medical complications if she had not had a preexisting disease in the first place, a decision that the Tenth Circuit reversed. Id. at 1009. Plaintiffs also cite to Vickers v. Boston Mutual Life Ins. Co., 135 F.3d 179, 182 (1st Cir. 1998) and Kellogg v. Metropolitan Life Ins. Co., 549 F.3d 818, 830 (10th Cir. 2008). Both cases involved fatal car accidents in which the claimants lost control of the vehicle – in Vickers, due to a heart attack, and in Kellogg, due to a seizure. In both cases, the courts rejected the insurance providers' arguments that the losses were not covered because the accidents were caused by preexisting conditions. Plaintiffs argue that Defendant is using a similar line of reasoning here in denying their claims due to Mr. Dowdy's preexisting condition of diabetes. ECF No. 27 at 22-23.

Plaintiffs' cases are not applicable. Mr. Dowdy's diabetes did not cause his car accident or the development of his infection. Rather, Mr. Dowdy's diabetes contributed to the need for amputation because it complicated the process of treating and healing his infection. The "but for" reasoning rejected by the courts in <u>Fought</u>, <u>Vickers</u>, and <u>Kellogg</u> is therefore distinguishable from Defendant's arguments in this case.

## CONCLUSION

Plaintiffs have not demonstrated a clear necessity for the Court to consider evidence beyond the administrative record. Plaintiffs have also not met their burden of demonstrating entitlement to benefits under their accidental death and dismemberment insurance plan. In light of these conclusions, the Court grants Defendant's Motion for Judgment and denies Plaintiff's Motion for Judgment.

IT IS SO ORDERED.

Dated: April 18, 2016

_____
JON S. TIGAR
United States District Judge